**KENNEDYS CMK LLP**
Christopher R. Carroll, Esq. (02448-1993)
Heather E. Simpson, Esq. (03628-2005)
Jillian G. Dennehy, Esq. (01369-2009)
120 Mountain View Boulevard
Basking Ridge, New Jersey 07920
(908) 848-6300
christopher.carroll@kennedyscmk.com
heather.simpson@kennedyscmk.com
jillian.dennehy@kennedyscmk.com
*Attorneys for Plaintiff*
*Allied World Assurance Company (US) Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALLIED WORD ASSURANCE COMPANY (US) INC., <br><br> Plaintiff <br><br> v. <br><br> BENECARD SERVICES, INC., <br><br> Defendants | Civil Action No.: <br><br> **DECLARATORY JUDGMENT COMPLAINT** |

Plaintiff Allied World Assurance Company (US) Inc. ("Allied World"), by and through its attorneys, Kennedys CMK LLP, brings this Declaratory Judgment Complaint against Defendant Benecard Services, Inc. ("Benecard"), and alleges as follows:

### INTRODUCTION

1. This insurance coverage action arises from an underlying lawsuit commenced by Smart Insurance Company ("Smart") against Allied World's insured, Benecard, asserting substantial damages due to Benecard's alleged breach of contract and fraudulent conduct (the "Smart Action").

2. Allied World provided Benecard with a defense in the Smart Action under an errors and omissions insurance policy subject to a reservation of rights, including that breach of contract and fraud damages are not covered losses under the policy.

3. Ultimately, Benecard entered into a settlement of the Smart Action without seeking or obtaining the consent of Allied World and now seeks reimbursement of a portion of that settlement payment from Allied World.

4. Allied World seeks a declaration that it is not required to indemnify Benecard for any portion of the settlement of the Smart Action.

## VENUE AND JURISDICTION

5. Allied World maintains its principal place of business in New York and is incorporated under the laws of the State of Delaware. At all relevant times, Allied World was and is authorized to do business in the State of New Jersey.

6. Benecard is incorporated in and maintains its principal place of business in the State of New Jersey.

7. Benecard commenced a lawsuit captioned <u>Benecard Services, Inc. v. Allied World Specialty Insurance Company et al.</u>, civil action number 3:15-cv-08593-MAS-TJB, in this Court seeking insurance coverage for the Smart Action from Allied World (under a separate directors' and officers' insurance policy) and several other insurers (the "Benecard NJ Action"), which remains pending in this Court to date.

8. This Court possesses subject matter jurisdiction over this action pursuant to 28 USC § 1332(a)(2) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because this action involves a dispute between citizens of different states.

9. Venue is proper in this Court pursuant to 28 USC § 1391(a) & (c).

2

## FACTUAL BACKGROUND

### A. The Smart Action

10. The Medicare Prescription Drug Improvement and Modernization Act established Medicare Part D, a voluntary prescription drug benefit program for seniors. The Act further provided that health insurance providers could contract with the Center for Medicare and Medicaid Services ("CMS") to become "Sponsors" that offer Part D prescription drug plans to Medicare beneficiaries.

11. In 2012, Smart received approval from CMS to act as a Medicare Part D Plan Sponsor.

12. On March 19, 2012, Smart and Benecard entered into an Amended and Restated Pharmacy Benefit Management and Administrative Services Agreement (the "Contract") pursuant to which Benecard became the provider of plan management services for Smart's Part D Plans. Under the Contract, Benecard assumed responsibility for nearly all operations of the Plans.

13. Smart allegedly paid Benecard $11 million under the Contract for services in connection with the Plans.

14. After the Plans were launched, however, Smart allegedly discovered that Benecard had failed to comply with its contractual obligations in numerous ways, including: a) its failure to properly handle and process beneficiary enrollment requests; b) its failure to provide required information to beneficiaries in a timely manner; c) its failure to provide a toll-free claims service to answer general program questions from beneficiaries, providers and pharmacies; d) its failure to provide proper notice to Smart of compliance issues; and e) its improper rejection of claims at the point of sale.

15. In March 2013, Benecard and Smart participated in a three-day CMS audit, which allegedly revealed to CMS numerous failures by Benecard under the Contract.

3

16. On April 23, 2013, CMS sanctioned the Plans, identifying numerous ways in which the Plans were failing to meet CMS requirements.

17. Smart retained outside consultants to assist Benecard in remedying these deficiencies. According to Smart, the consultants concluded that Benecard's staff was not knowledgeable in Part D Plan management, that Benecard's computer logic for applying the formulary was "hopelessly flawed," that Benecard had failed to properly code the computer systems and to send the required notices to Plan beneficiaries, among other failures.

18. In addition to these breaches of the Contract, Smart alleged that Benecard's representatives (including the CEO and other officers) made certain fraudulent misrepresentations and omissions "knowingly and intentionally" in an effort to conceal the problems and ensure that Smart did not terminate the Contract.

19. By June 2013, the Plans still were not adjudicating claims properly. As a result, CMS informed Smart that it would terminate the Plans on August 1, 2013 unless Smart sold them by July 31, 2013. Smart sold the Plans on August 31, 2013 for $12 million, which Smart describes as a "fire-sale" price that was a "fraction of their actual market value."

20. On August 21, 2013, Smart sent a letter to Benecard revoking its responsibilities under the Contract and terminating the Contract as of September 1, 2013.

21. On October 10, 2013, Smart and Benecard executed a Transition Agreement, pursuant to which Benecard agreed to perform certain services to effectuate transition of the Plans to the new owner.

22. On June 8, 2015, Smart filed a lawsuit against Benecard in the United States District Court for the Southern District of New York, civil action number 15-cv-04384, asserting causes of action for: 1) Breach of Contract; and 2) Fraudulent Misrepresentation/Omission and Fraudulent

Concealment. See Ex. A.

23. In particular, the Smart Action contains the following allegations related to Benecard's breach of contract:

- "This action arises out of the failure of Benecard to perform its contractual obligation to manage Smart's Medicare Part D Prescription Drug plans." (Ex. A ¶ 1.)

- "The parties' contract delegated to Benecard virtually all aspects associated with management of the Plans. The contract expressly required Benecard to perform these obligations consistent with federal law, as well as any instructions, rules and regulations issued by the Centers for Medicare & Medicaid Services." (Ex. A ¶ 2.)

- "Despite being paid approximately $11 million under the contract, Benecard failed to live up to its contractual obligation on approximately 100,000 different occasions within the first six months after the launch of the Plans." (Ex. A ¶ 3.)

- "Benecard's utter failure to perform its contract obligations and delegated functions harmed Smart and was the primary cause of the sanctions and sale-order imposed by CMS." (Ex. A ¶ 75.)

- "Benecard materially breached the Agreement by taking the actions set forth [in the Smart Action Complaint]." (Ex. A ¶ 86.)

- "Smart has been injured by Benecard's breaches of the Agreement. Among other things, Smart paid millions of dollars to Benecard for inadequate services. It also paid millions of dollars to others to perform Benecard's contractual obligations, to assist Benecard with those obligations, and to remedy Benecard's numerous breaches." (Ex. A ¶ 90.)

24. In addition, the Smart Action alleged that Benecard engaged in fraudulent conduct to prevent Smart from terminating the Contract and to conceal deficiencies in the Plans:

- "The [Smart] action also arises out of a number of intentionally false representations and material omissions that Benecard made to convince Smart not to terminate their contract." (Ex. A ¶ 1.)

- "[Benecard] knew, or strongly suspected, that significant problems were going to occur once the Plan benefits went into effect. However, instead of informing Smart of these problems, Benecard concealed the information from it. Benecard's senior management, including Chief Executive Officer Michael Perry, instructed Benecard's

staff to make sure Smart falsely believed Benecard would be ready to launch the Plans by January 1." (Ex. A ¶ 38.)

- "Benecard made these misrepresentations and omissions, and concealed critical information from Smart, knowingly and intentionally and with the goal of ensuring that Smart did not terminate the Agreement." (Ex. A ¶ 57.)

- "If Benecard had not made these misrepresentations and omissions, and if Smart had been aware of the true nature and depth of the problems at Benecard, Smart would have terminated the Agreement, switched to a new [Pharmacy Benefit Manager] much earlier and saved its Plans for further damage." (Ex. A ¶ 69.)

- "Smart relied upon the misrepresentations, omissions and concealments in determining whether to terminate the Agreement and replace Benecard. Smart also relied in determining to take other actions necessary to save its Plans." (Ex. A ¶ 102.)

- "Benecard's conduct was gross, wanton, willful, and of high moral culpability. Benecard acted with malice." (Ex. A ¶ 105.)

25. By letter filed on the public docket on September 2, 2016, Benecard's counsel advised the court that the parties had agreed to a settlement of all claims in the Smart Action and that settlement paperwork was being prepared.

26. On or about September 22, 2016, Benecard entered into a confidential settlement agreement in connection with the Smart Action (the "Settlement").

**B.   The Allied World Policy**

27. Allied World issued to Managed Care Organization Errors and Omissions Liability Policy No. 0303-3889 to Benecard, effective April 12, 2014 through April 12, 2015 and with limits of $5 million (the "Allied World Policy").

28. The insuring agreement of the Allied World Policy provides as follows:

The **Underwriter** will pay on behalf of any **Insured** **Loss** which the **Insured** is legally obligated to pay as a result of a **Claim** that is first made against the **Insured** during the **Policy Period** or during any applicable Extended Reporting Period.

29. The definition of "Loss" covered by the Allied World Policy expressly excludes "non-monetary relief," and "fees, amounts, benefits or coverage owed under any contract with any

6

party including providers of health care services, health care plan or trust or workers' compensation policy or plan or program of self-insurance."

    30.    The Allied World Policy excludes coverage for any damages arising from fraudulent conduct as follows:

> (A)    Except for **Defense Expenses**, the **Underwriter** shall not pay **Loss** for any **Claim** brought about or contributed by:
>
>> (1) any willful misconduct or dishonest, fraudulent, criminal or malicious act, error or omission by any **Insured**;
>> (2) any willful violation by any **Insured** of any law, statute, ordinance, rule or regulation; or
>> (3) any **Insured** gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled.
>
> For purposes of determining the applicability of this EXCLUSION (A); no **Wrongful Act** of any **Insured** shall be imputed to any other **Insured**. Determination of the applicability of this EXCLUSION (A) may be made by an admission or final adjudication in a proceeding constituting the **Claim**, or in a proceeding separate from or collateral to any proceeding constituting the **Claim**.

    31.    In addition, as a condition to coverage under the Allied World Policy, Benecard is required to obtain Allied World's written consent before entering into any settlement:

> (D)    **Defense and Settlement:**
>
>> (1) The **Underwriter** will have no duty under this Policy to defend any **Claim** but, at its option, may associate in the defense or settlement of a **Claim**. The Insureds will defend and contest any **Claim** made against them. In conducting a defense, the **Insureds** will retain counsel approved by the **Underwriter**, such approval not to be unreasonably withheld. No **Defense Expenses** may be incurred, and no settlement or offer of settlement of any **Claim** may be made, without the **Underwriter's** prior written consent, such consent not to be unreasonably withheld. No coverage is available under this Policy for any **Defense Expenses** incurred, or any settlements or settlement offers made, without the **Underwriter's** prior written consent.

    32.    Finally, the Allied World Policy also contains a provision addressing a situation where more than one policy issued by Allied World is applicable to a particular loss:

> (G)    **Other Insurance; Other Indemnification:**

\* \* \*

 (2) If any other policy or policies issued by the Underwriter or any of its affiliated companies, or by any predecessors or successors of the Underwriter or its affiliated companies, shall apply to any **Claim**, then the aggregate limit of liability with respect to all **Loss** under this Policy and all covered loss under such other policies shall not exceed the highest applicable limit of liability, subject to its applicable deductible or retention, that shall be available under any one of such policies, including this Policy. This CONDITION (G)(2) shall not apply with respect to any other policy which is written only as specific excess insurance over the Limit of Liability of this Policy.

33. By letter dated March 12, 2015, Allied World agreed to fund defense costs in connection with the Smart Action subject to a reservation of rights to deny coverage based upon various policy provisions, including the definition of "Loss," the fraud exclusion and several policy conditions.

34. Allied World incurred approximately $3.8 million in defense costs on behalf of Benecard in connection with the Smart Action.

35. On or about December 14, 2015, Benecard commenced the Benecard NJ Action against Allied World (under a separate directors' and officer's policy) and several other insurers seeking defense and indemnity in connection with the Smart Action. Benecard did not include the Allied World Policy in that lawsuit.

36. Benecard now seeks the remaining $1.2 million in limits under the Allied World Policy towards reimbursement of the underlying Settlement of the Smart Action.

### Count I

### (Declaratory Judgment – No Covered Loss)

37. Allied World repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

38. The Smart Action asserts only two causes of action sounding in breach of contract

and fraud, respectively.

39. Smart alleged damages arising from Benecard's failure to fulfill its contractual obligations and its fraudulent misrepresentations, omissions and concealments aimed at preventing Smart from terminating the Contract.

40. Smart's alleged damages included the $11 million in payments made to Benecard under the Contract, the costs to hire outside consultants to assist Benecard and attempt to salvage the Plans, and the loss sustained by way of Smart being forced to sell the Plans at a discounted price as a result of the sanctions entered by CMS due to Benecard's contractual failures.

41. The Settlement of the Smart Action resolved both the breach of contract and fraud claims against Benecard.

42. The Allied World Policy expressly excludes coverage for any "amounts . . . owed under any contract."

43. In addition, the Allied World Policy expressly excludes coverage for any loss brought about or contributed to by "any willful misconduct or dishonest, fraudulent, criminal or malicious act, error or omission by any Insured" and "any Insured gaining any profit, remuneration or advantage to which such Insured was not legally entitled."

44. Because both contractual damages and fraud damages are barred from coverage under the Allied World Policy, Allied World has no obligation to indemnify Benecard for any portion of the Settlement.

45. As a result of the foregoing, an actual and justiciable controversy exists between Allied World and Benecard regarding Allied World's purported obligations under the Allied World Policy in connection with the Settlement.

46. Accordingly, Allied World is entitled to a declaration that it has no indemnity

obligation to Benecard with respect to the Settlement.

## COUNT II

### (Declaratory Judgment – Lack of Consent)

47. Allied World repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

48. Under the Allied World Policy, "no settlement or offer of settlement of any Claim may be made, without [Allied World's] prior written consent, such consent not to be unreasonably withheld. No coverage is available . . . for any . . . settlements or settlement offers made without [Allied World's] prior written consent."

49. Despite the fact that Allied World had been incurring millions of dollars in defense costs on behalf of Benecard, Benecard and its defense counsel did not keep Allied World apprised of all material developments in the Smart Action.

50. Benecard did not provide notice to Allied World regarding the terms of the settlement, including the amount, prior to entering into it.

51. Benecard did not seek Allied World's consent to the Settlement prior to entering into it.

52. Benecard did not obtain Allied World's consent to the Settlement prior to entering into it.

53. Benecard's failure to obtain Allied World's written consent to the Settlement constitutes a violation of a condition precedent to coverage under the Allied World Policy.

54. Allied World has no obligation to indemnify Benecard for any portion of the Settlement.

55. As a result of the foregoing, an actual and justiciable controversy exists between Allied World and Benecard regarding Allied World's purported obligations under the Allied

World Policy in connection with the Settlement.

56. Accordingly, Allied World is entitled to a declaration that it has no indemnity obligation to Benecard with respect to the Settlement.

## Count III

### (Declaratory Judgment – Limits)

57. Allied World repeats, reiterates and realleges each and every allegation of the preceding paragraphs as if set forth herein, verbatim and fully at length.

58. For the reasons set forth herein, Allied World has no obligation to provide coverage for the Settlement.

59. However, if it is determined that Allied World has an indemnity obligation under the Allied World Policy, the maximum amount of insurance payable to Benecard under any and all policies issued by Allied World is $5 million.

60. In particular, Condition (G)(2) of the Allied World Policy states:

If any other policy or policies issued by the Underwriter or any of its affiliated companies, or by any predecessors or successors of the Underwriter or its affiliated companies, shall apply to any Claim, then the aggregate limit of liability with respect to all Loss under this Policy and all covered loss under such other policies shall not exceed the highest applicable limit of liability, subject to its applicable deductible or retention, that shall be available under any one of such policies, including this Policy. This Condition (G)(2) shall not apply with respect to any other policy which is written only as specific excess insurance over the Limit of Liability of this Policy.

61. Thus, if Allied World is required to pay the remaining limits of the Allied World Policy towards reimbursement of the Settlement, Allied World has no obligation to pay any amounts towards the Smart Action under any other policy, including the directors' and officers' policy at issue in the Benecard NJ Action.

62. As a result of the foregoing, an actual and justiciable controversy exists between Allied World and Benecard regarding Allied World's purported obligations under the Allied

11

World Policy in connection with the Settlement.

63. Accordingly, in the alternative, Allied World is entitled to a declaration that Allied World's maximum coverage obligation to Benecard in connection with the Smart Action is $5 million.

**WHEREFORE**, Plaintiff Allied World Specialty Insurance Company prays for judgment as follows:

(a) For a declaration that Allied World has no duty to indemnify Benecard for any portion of the Settlement in connection with the Smart Action;

(b) In the alternative, for a declaration that Allied World's maximum coverage obligation to Benecard in connection with the Smart Action is $5 million;

(c) For its attorneys' fees and costs pursuant to law; and

(d) For such other relief as is just and equitable herein.

Dated: November 30, 2017

**KENNEDYS CMK LLP**

By: *Heather E. Simpson*
Christopher R. Carroll, Esq.
Heather E. Simpson, Esq.
Jillian G. Dennehy, Esq.
120 Mountain View Boulevard
Basking Ridge, New Jersey 07920
(T): 908-848-6300
(F): 908-848-6310
*Attorneys for Plaintiff*
*Allied World Assurance Company (US) Inc.*

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2

I certify, under penalty of perjury under the laws of the United States of America, that the subject matter in controversy in this action is the subject of the following proceedings:

- Benecard Services, Inc. v. Allied World Specialty Insurance Company et al., civil action number 3:15-cv-08593-MAS-TJB, filed in the United States District Court for the District of New Jersey on December 14, 2015; and

- Benecard Services, Inc. v. Allied World Assurance Company (US) Inc., Case No. N17C-11-073, filed in the Superior Court of Delaware on November 8, 2017.

By: *Heather E. Simpson*

Heather E. Simpson, Esq.
KENNEDYS CMK LLP
120 Mountain View Boulevard
Basking Ridge, New Jersey 07920
(T): 908-848-6300
(F): 908-848-6310
*Attorneys for Plaintiff*
*Allied World Assurance Company (US) Inc.*