**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALLIED WORLD ASSURANCE COMPANY (US) INC., <br><br> Plaintiff, <br><br> v. <br><br> BENECARD SERVICES, INC., <br><br> Defendant. | Civil Action No. 17-12252 (MAS) (TJB) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

      This matter comes before the Court upon Defendant Benecard Services Inc.'s ("Benecard") Motion for Partial Summary Judgment ("Motion") (ECF No. 43) and Plaintiff Allied World Assurance Company (US) Inc. ("Allied World") Opposition to Benecard's Motion and Cross-Motion for Summary Judgment ("Cross-Motion") (ECF No. 50). Benecard opposed Allied World's Cross-Motion (ECF No. 60), and Allied World filed a reply (ECF No. 64). The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Benecard's Motion for Partial Summary Judgment is denied and Allied World's Cross-Motion for Summary Judgment is granted.

**I.    BACKGROUND**

    **A.    Undisputed Facts**

        **1.    The Smart Action**

      In 2012, Smart Insurance Company ("Smart") was approved by the Centers for Medicare and Medicaid Services ("CMS") to act as a Medicare Part D plan sponsor. (Benecard's Statement

of Material Facts ("BMF") ¶ 2, ECF No. 48 (citing Smart's Compl. ¶ 24, Ex. A to Bartell Cert.,

ECF No. 43-2); Allied World's Responsive Statement of Material Facts ("AWRMF") ¶ 2, ECF

No. 50-2 at 1.) Benecard agreed to provide Smart with certain services in connection with the Part

D plans. (BMF ¶ 3 (citing Smart's Compl. ¶¶ 16–19); AWRMF ¶ 3.) Smart alleged that Benecard

was tasked with (1) handling all matters related to member enrollment; (2) managing the plan

formulary and adjudicating member claims for coverage at the point of sale; (3) administering the

coverage determination, appeal, and grievance process; (4) providing Smart with real-time, online

access to Benecard's prescription drug claims database and system; (5) running the call center and

answering member questions; and (6) complying with federal law and CMS requirements.

(Smart's Compl. ¶ 19.)

On April 23, 2013, after auditing the plans, CMS sanctioned Smart, suspending enrollment

in and marketing of the plans. (BMF ¶ 4 (citing Smart's Compl. ¶ 50); AWRMF ¶ 4; Smart's

Compl. ¶ 50.) The day before CMS imposed sanctions, Smart wrote to Benecard advising it that

"a dispute between Smart and Benecard [was] a likelihood," and asking Benecard to "preserv[e]

the documents relevant to the parties' relationship" and to "take whatever actions are necessary to

preserve status quo and protect the parties' respective rights and obligations." (BMF ¶¶ 6–7

(quoting Smart's Apr. 22, 2014 Correspondence, Ex. B to Bartell Cert., ECF No. 43-3); AWRMF

¶¶ 6–7.) Smart sold the plans that August and, on December 15, 2014, advised Benecard that it

"intend[ed] to pursue claims against [it] for, among other things, breach of contract and fraud."

(BMF ¶¶ 5, 8 (quoting Smart's Dec. 15, 2014 Correspondence, Ex. C to Bartell Cert., ECF

No. 43-4); AWRMF ¶¶ 5, 8; Smart's Compl. ¶ 74; Smart's Dec. 15, 2014 Correspondence.)

On June 8, 2015, Smart filed suit against Benecard in the United States District Court for

the Southern District of New York in an action captioned *Smart Insurance Company v. Benecard*

Case 3:17-cv-12252-MAS-TJB   Document 73   Filed 05/31/20   Page 3 of 35 PageID: 1045

*Services, Inc.*, No. 15-4384 (the "Smart Action"), (BMF ¶ 9; AWRMF ¶ 9), alleging claims "aris[ing] out of the failure of Benecard to perform its contractual obligation to manage Smart's Medicare Part D Prescription Drug plans," and "out of a number of intentionally false representations and material omissions that Benecard made to convince Smart not to terminate their contract," (Smart's Compl. ¶ 1). Smart asserted two counts: (1) breach of contract and (2) fraudulent misrepresentation, omission, or concealment. (*Id.* ¶¶ 86–92, 94–105.)

Beginning with the contractual failures, (*id.* ¶¶ 27, 54–55), Smart alleged that,

> [a]fter the Plans were launched on January 1, 2013, Smart's monitoring efforts uncovered a number of problems with Benecard's performance, including but not limited to: (a) its failure to properly handle and process a number of beneficiary enrollment requests, (b) its failure to provide required information to beneficiaries in a timely manner, (c) its failure to provide a toll-free claims service to answer general program questions and specific inquiries from beneficiaries, providers and pharmacies, (d) its failure to provide proper notice to Smart of certain compliance issues and (e) its improper rejection of claims at the point-of-sale.

(*Id.* ¶ 33.) Smart claimed that its supervision of Benecard's efforts to redress those problems "were thwarted by Benecard's . . . efforts to conceal the true nature and extent of its problems from Smart." (*Id.* ¶ 35.) According to Smart, Benecard knew even before the launch date that it was not going to be ready to process claims or handle coverage determination requests, appeals, and grievances, and that significant problems were going to occur on launch. (*Id.* ¶ 38.) Nevertheless, Smart alleged, Benecard "concealed the information," and "Benecard's senior management, including Chief Executive Officer Michael Perry, instructed Benecard's staff to make sure Smart falsely believed Benecard would be ready to launch the Plans by [January 1, 2013]." (*Id.*) Smart claimed Benecard ignored its corrective efforts, refused assistance, and spurned Smart's repeated requests for real-time access to its systems until the eve of CMS's audit. (*Id.* ¶¶ 39–42.) Furthermore, after CMS's audit identified several problems with Benecard's system, including the

improper denial of prescription drug coverage at the point of sale, Smart alleged "Benecard represented to Smart that it had fixed the identified problems." (*Id.* ¶¶ 45–47.) According to Smart, CMS's sampling of claims showed Benecard had not fixed many of the issues and identified ten new deficiencies. (*Id.* ¶ 47.) CMS imposed sanctions, including prohibiting new member enrollment and marketing, which Smart alleged cost it "tens of thousands of new members and millions of dollars." (*Id.* ¶ 50.)

Turning to Benecard's alleged "misrepresentations, omissions and concealment," Smart alleged Benecard "made a number of false representations and material omissions" "and concealed critical information from Smart, knowingly and intentionally and with the goal of ensuring that Smart did not terminate the Agreement." (*Id.* ¶¶ 56–57.) As an example, Smart alleged "Benecard representatives, including Michael Perry, represented to Smart throughout the last quarter of 2012 that Benecard would be ready to handle its claim processing responsibilities and coverage determination, appeal and grievance processing responsibilities on January 1, 2013," but that "Benecard knew these representations were false," and "Perry instructed his staff to conceal from Smart that Benecard would not be ready and that it was falling further and further behind schedule." (*Id.* ¶ 58.) Smart further alleged, among many other examples, that Benecard's senior personnel instructed its employees to ignore Smart's corrective action plans, that Benecard assigned untrained personnel to its call center after telling Smart it would rapidly increase the number of properly trained staff, and that Benecard's Chief Operating Officer told employees that its system was proprietary and that Smart would not be given access to it after repeatedly representing to Smart that it would be given real-time online access. (*Id.* ¶¶ 59–61.) Smart asserted that "[w]hen Benecard made these misrepresentations and omissions to Smart, it knew they were false, or, alternatively, it made them recklessly and without knowledge as to their truth or falsity[,]"

4

and that Benecard "knew it was concealing information that was material to Smart in determining whether to terminate the Agreement" and "made these statements and omissions with the intention of Smart relying on them, with the intent to deceive Smart or with reckless disregard." (*Id.* ¶¶ 97–99.) Smart claimed that, "[i]f Benecard had not made these misrepresentations and omissions, and if Smart had been aware of the true nature and depth of the problems at Benecard, Smart would have terminated the Agreement, switched to a new [pharmacy benefit manager] much earlier and saved its Plans from further damage." (*Id.* ¶ 69.) Smart asserted it had been damaged as a result of Benecard's misrepresentations, omissions, and concealment. (*Id.* ¶ 104.) Smart sought damages in the amount of not less than $75 million. (BMF ¶ 10; AWRMF ¶ 10.)

### 2. The Policy

Benecard purchased a Managed Care Organization Errors and Omissions Liability Policy (the "Allied World E&O Policy" or the "Policy") from Allied World, effective from April 12, 2014 through April 12, 2015. (BMF ¶¶ 21–22; AWRMF ¶¶ 21–22.) Allied World also issued a Directors and Officers liability policy under which Benecard also seeks coverage for the Smart Action in a separate proceeding. (Allied World's Counterstatement of Material Facts ("AWMF") ¶ 22, ECF No. 50-2 at 8; Benecard's Resp. to Allied World's Counterstatement of Material Facts ("BRMF") ¶ 22, ECF No. 54-3 at 1.)

The Allied World E&O Policy provides that "[t]he **Underwriter** will pay on behalf of any **Insured Loss** which the Insured is legally obligated to pay as a result of a **Claim** that is first made against the **Insured** during the **Policy Period**." (Allied World E&O Policy at AW192, Ex. E to Bartell Cert., ECF No. 43-6.) "**Loss**" includes "[d]efense [e]xpenses" and "any monetary amount which an **Insured** is legally obligated to pay as a result of a **Claim**." (*Id.* at AW202 (emphasis in original).) "'**Claim**' means any written notice received by any **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act** which took place on or after the

5

retroactive date." (*Id.* at AW201.) "Wrongful Act" means, in part, "any actual or alleged act, error[,] or omission in the performance of, or any failure to perform, a **Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting with the scope of his or her duties or capacity as such[.]" (*Id.* at AW203–04.) "Managed Care Activities" include

> **Provider Selection**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters[,] or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care or workers' compensation plans.

(*Id.* at AW202.) That definition includes "Pharmacy Benefit Management," which is defined as "drug formulary development and management; pharmacy network development; benefit design development and management, including clinical guidelines related to pharmacy and therapeutics, quality assurance and patient safety, and medication therapy; **Claim Services** in connection with pharmacy benefits; rebate negotiation and management; and negotiation of drug pricing." (*Id.* at AW180.) The Policy has a $5 million liability limit, which is reduced by the payment of defense costs. (BMF ¶ 29; AWRMF ¶ 29.)

"**Loss**" does not include:

> (1) fines, penalties, taxes . . .
>
> (2) fees, amounts, benefits[,] or coverage owed under any contract with any party including providers of health care services, health care plan or trust, insurance or workers' compensation policy or plan or program of self-insurance;
>
> (3) non-monetary relief or redress in any form, including without limitation the cost of complying with any injunctive, declaratory[,] or administrative relief; or
>
> (4) matters which are uninsurable under applicable law.

6

(Allied World E&O Policy at AW202.) The Policy also contains a "Fraud Exclusion," which provides:

> (A) Except for **Defense Expenses**, the **Underwriter** shall not pay **Loss** for any **Claim** brought about or contributed to by:
>
> (1) any willful misconduct or dishonest, fraudulent, criminal or malicious act, error[,] or omission by any **Insured**;
>
> (2) any willful violation by any **Insured** of any law, statute, ordinance, rule[,] or regulation; or
>
> (3) any **Insured** gaining any profit, remuneration[,] or advantage to which such Insured was not legally entitled.
>
> For the purposes of determining the applicability of this EXCLUSION (A); no **Wrongful Act** of any **Insured** shall be imputed to any other **Insured**. Determination of the applicability of this EXCLUSION (A) may be made by an admission or final adjudication in a proceeding constituting the **Claim**, or in a proceeding separate from or collateral to any proceeding constituting the **Claim**.

(*Id.* at AW181.) The Policy further contains two conditions: the "Consent Clause" and "Condition (G)(2)." (AWMF ¶¶ 25–26; BRMF ¶¶ 25–26.) The Consent Clause, in relevant part, states:

> No **Defense Expenses** may be incurred, and no settlement or offer of settlement of any **Claim** may be made, without the **Underwriter's** prior written consent, such consent not to be unreasonably withheld. No coverage is available under this Policy for any **Defense Expenses** incurred, or any settlements or settlement offers made, without the **Underwriter's** prior written consent.

(Allied World E&O Policy at AW196.) Condition (G)(2) provides that:

> If any other policy or policies issued by the Underwriter or any of its affiliated companies, or by any predecessors or successors of the Underwriter or its affiliated companies, shall apply to any **Claim**, then the aggregate limit of liability with respect to all **Loss** under this Policy and all covered loss under such other policies shall not exceed the highest applicable limit of liability, subject to its applicable deductible or retention, that shall be available under any one of such policies, including this Policy. This **CONDITION** (G)(2) shall not apply with respect to any other policy which is

> written only as specific excess insurance over the Limit of Liability
> of this Policy.

(*Id.* at AW197.)

On March 12, 2015, Allied World sent correspondence acknowledging "the allegations . . . appear to constitute a Claim that was first made against an Insured during the Policy Period and reported to Allied World as indicated earlier in correspondence from Allied World dated June 9, 2014." (Allied World's Mar. 12, 2015 Correspondence 5, Ex. F to Bartell Cert., ECF No. 43-7.) In its correspondence, Allied World "reserve[d] all rights to which it is entitled under the policies and at law," and "reserve[d] all of its rights, . . . including but not limited to the right to assert additional terms or conditions of the Policies that may become applicable as new information is learned, and the right to deny or limit coverage for this matter on additional and/or alternative bases." (*Id.* at 9.) Subsequently, Allied World paid Benecard's defense costs under the terms of the Policy. (BMF ¶ 36; AWRMF ¶ 36.)

### 3.    Settlement of the Smart Action

Benecard initially moved to dismiss Smart's fraud claims, but the court denied the motion. (BMF ¶ 15; AWRMF ¶ 15.) During the course of discovery, Smart moved for sanctions against Benecard's counsel, DLA Piper, for alleged discovery abuses. *Smart Ins. Co. v. Benecard Servs., Inc.*, No. 15-4384, 2016 WL 3620789, at *3 (S.D.N.Y. June 29, 2016), *order vacated on reconsideration*, No. 15-4384, 2017 WL 149986 (S.D.N.Y. Jan. 13, 2017); (*see also* AWMF ¶ 31; BRMF ¶ 31). The court granted the motion and imposed monetary penalties on defense counsel. *Smart Ins. Co.*, 2016 WL 3620789, at *13; (*see also* AWMF ¶ 32; BRMF ¶ 32). On the same day, Benecard moved for summary judgment on Smart's fraud claims. (BMF ¶ 16; AWRMF ¶ 16; AWMF ¶ 34; BRMF ¶ 34.) Benecard's counsel moved for reconsideration of the sanctions.

(AWMF ¶ 35; BRMF ¶ 35.) Benecard instructed Allied World not to pay DLA Piper's invoices while it considered its options. (AWMF ¶ 37; BRMF ¶ 37.)

By August 16, 2016, Benecard advised Allied World that "[t]he parties . . . [were] currently discussing the possibility of meeting for the purpose of reaching a settlement." (Benecard's Suppl. Statement of Material Facts ("BSMF") ¶ 6, ECF No. 54-3 at 7; Allied World's Resp. to Benecard's Suppl. Statement of Material Facts ("AWRSMF") ¶ 6, ECF No. 64-1.) Benecard retained additional counsel to assist it in pursuing settlement with Smart. (AWMF ¶ 38; BRMF ¶ 38.) On September 1, 2016, Benecard informed an Allied World representative that "a settlement between Benecard and Smart was in the process of being finalized," that "[i]t was expected to be completed that day or very shortly," and that Benecard "would not give [the representative] [the] settlement number until the settlement [was] completed, but . . . stated that the settlement [was] above the policy limits." (AWMF ¶¶ 39–40; BRMF ¶¶ 39–40; Claim Summary Report 3, Ex. G to Bartell Cert., ECF No. 43-8.) Allied World's notes further stated:

> [Benecard] noted that [it] understood that defense expenses would soon exhaust the limits of liability for the E & O policy if the matter continued to trial. Obviously, [Benecard] would like to have money go towards a settlement rather than defense expenses. [Benecard] noted that [it] [has] an argument that DLA [Piper] was more concerned with their billing than advancing the insured's interests. [The representative] had no comment to that assertion and there was no discussion on contribution from Allied World towards the settlement.

(*Id.*)

On September 2, 2016, Benecard and Smart filed joint correspondence with the court "to inform the [c]ourt that the parties . . . agreed to a settlement of all claims that were or could have been asserted in connection with the events set forth in the lawsuit styled *Smart Insurance Company v. Benecard Services, Inc.*," that "[t]he parties [would] promptly embody the terms of their settlement in final settlement documents," and that the parties "respectfully request[ed] a stay

of 30 days of all upcoming pre-trial deadlines." (Joint Sept. 2, 2016 Correspondence, Ex. C to Simpson Cert., ECF No. 50-7.)

On September 8, 2016, Benecard's counsel advised Allied World's counsel that Benecard and Smart had reached a confidential settlement-in-principle. (BSMF ¶¶ 9–10; AWRSMF ¶¶ 9–10.) Prior to the court's ruling on Benecard's summary judgment motion, Benecard and Smart formally settled September 22, 2016, resolving both the breach of contract and misrepresentation claims ("the Smart Settlement"). (BMF ¶¶ 17–18; AWRMF ¶¶ 17–18; AWMF ¶ 44; BRMF ¶ 44.)

Benecard successfully negotiated with DLA Piper to reduce its invoice by $1.6 million. (BMF ¶¶ 38–39; AWRMF ¶¶ 38–39.) Allied World was not invited to participate in Benecard's negotiations with DLA Piper. (AWMF ¶ 44(b);[1] BRMF ¶ 47.) Allied World paid defense counsel approximately $3.8 million. (BMF ¶ 40; AWRMF ¶ 40.) In its July 19, 2016 Claim Summary Report, Allied World had projected that Benecard's defense costs would exceed the $5 million limit. (Claim Summary Report 2.) After settlement, Benecard asked Allied World to contribute the $1.2 million not exhausted on defense costs to the Smart Settlement. (BMF ¶ 43; AWRMF ¶ 43.) Allied World declined to indemnify any portion of the Smart Settlement. (BMF ¶ 44; AWRMF ¶ 44.)

### B.   Disputed Facts

Allied World disputes Benecard placed it on notice of the Smart Action's claims on April 30, 2014, noting that the Smart Action had not yet been filed, so no claims were pending against Benecard at that time. (BMF ¶ 33; AWRMF ¶ 33.) Allied World rejects Benecard's assertion that

---

[1] After paragraph forty-five, Allied World's Counterstatement of Material Facts restarts its paragraph numbers at forty-three. All duplicate numbers are denoted by (b).

it would have paid the Policy limit had Benecard not negotiated down defense counsel's invoices, explaining that it would have reviewed the invoices and paid those amounts that were reasonably and appropriately billed. (BMF ¶ 41; AWRMF ¶ 41.)

As to the Smart Settlement, Allied World disputes that Benecard advised it of a settlement-in-principle before the parties finalized the settlement. Allied World contends that, on September 1, 2016, Benecard's counsel informed it that a settlement was "in the process of being finalized" without giving Allied World a figure. (BMF ¶ 45; AWRMF ¶ 45 (citing Claim Summary Report 3).) Further, Allied World disputes that Benecard asked it to apply any remaining Policy limits to the settlement. (BMF ¶ 46; AWRMF ¶ 46.) Allied World argues "[t]here was no 'request' for Allied World to contribute payment to the settlement on September 1, 2016," and "no 'request' for Allied World's consent to the settlement." (AWRMF ¶ 47.) "To the contrary," Allied World asserts, "neither the amount nor the terms of the settlement [were] disclosed to Allied World until after the final settlement agreement was executed." (*Id.*) Allied World claims that "[d]uring the September 1, 2016 conversation, there was no request for Allied World to contribute payment to the settlement and, thus, nothing to remain 'silent' in response to." (*Id.* ¶49.) Allied World claims "Benecard mischaracterizes the quote from Allied World's claim notes, which states, '[T]here was no discussion on contribution from Allied World towards the settlement.'" (*Id.* (quoting Claim Summary Report 3).) Allied World also disputes Benecard's assertion that there was no binding settlement on September 8, 2016, when Benecard's counsel informed Allied World's that Benecard and Smart had reached a settlement-in-principle. (BSMF ¶¶ 9–10; AWRSMF ¶¶ 9–10.)

Benecard claims Allied World never objected to Benecard's settlement activities, demanded an opportunity to participate, or sought additional information. (BMF ¶ 48.) Instead, Benecard asserts that Allied World stayed silent on its contribution to the settlement. (*Id.* ¶ 49.)

Benecard disputes that it did not seek Allied World's consent before entering into the proposed settlement, claiming "at that time, Allied [World] had exhausted its E&O Policy limits, and Allied [World] solicited no request for consent after receiving notice of the settlement-in-principle several times before the parties finalized the settlement." (BRMF ¶ 43.) Further, Benecard contends that it did not possess "any obligation to provide Allied [World] a copy of the Smart [S]ettlement before it was finalized because at that time, Allied [World] had exhausted its E&O Policy limits, and the insurer solicited no request for a copy of the settlement despite repeatedly receiving notice of the settlement-in-principle." (*Id.* ¶ 45.)

Allied World claims that it is without sufficient information or knowledge to determine whether Benecard incurred more than $5 million in defense costs before negotiating down DLA Piper's invoices. (BSMF ¶¶ 2–3; AWRSMF ¶¶ 2–3.) And, although Allied World admits Benecard provided it with litigation status updates, it disputes that it was kept fully updated and that the updates were "regular" and "detailed," arguing instead that the updates were limited. (BSMF ¶¶ 15–16, 18, 20; AWRSMF ¶¶ 15–16, 18, 20.)

## II.    PARTIES' CLAIMS

In its three-count Complaint, Allied World seeks a declaratory judgment that it is not under any obligation to indemnify the Smart Settlement or, in the alternative, that its maximum coverage obligation in relation to the Smart Action is $5 million. (Compl. ¶¶ 46, 63., ECF No. 1.) Allied World alleges:

1.    Contractual damages and fraud damages are barred under the Allied World E&O Policy. (*Id.* ¶ 44.)

2.    Benecard did not notice Allied World of the settlement and did not seek or obtain Allied World's consent to the settlement, thereby violating a condition of coverage under the Allied World E&O Policy. (*Id.* ¶¶ 50–53.)

3.      Pursuant to Condition (G)(2), if Allied World is determined to be obligated to provide indemnity coverage, it is only liable for a maximum of $5 million under both the Allied World E&O and D&O Policies. (*Id.* ¶¶ 59–61.)

In its Motion, Benecard seeks indemnification of the Smart Settlement and the reimbursement of counsel fees and costs incurred in filing its Motion. (Moving Br. 11, 23, ECF No. 47.) In addition to opposing Benecard's Motion, Allied World cross-moves for summary judgment that it has no duty to indemnify Benecard for the settlement of the Smart Action. (Cross Br. 2, ECF No. 50-1.)

## III.   PARTIES' POSITIONS

### A.   Benecard's Moving Brief

Benecard argues Allied World is responsible for indemnifying the Smart Settlement up to the Allied World E&O Policy's $5 million limit. (Moving Br. 9–11.) Benecard claims the Smart Settlement is not excluded from the definition of "loss" because the Policy excludes "fees, amounts, benefits or coverage owed under any contract," whereas Smart sought damages for breach of contract. (*Id.* at 13 (quoting Allied World E&O Policy at AW202).) Benecard further contends that it never operated as an insurance company or as a provider of health care services. (*Id.*) It opines that the exclusion was likely aimed at another insured, Heartland Fidelity Insurance Company. (*Id.* at 13–14.) Citing as an example the exclusion at issue in *Old Berliner Liquidating Tr. v. N. River Ins. Co.*, No. A-5352-10T2, 2012 WL 1868379, at *1 (N.J. Super. Ct. App. Div. May 24, 2012), Benecard submits that the exclusion is not a breach of contract exclusion and must be construed narrowly. (*Id.* at 14.) Benecard contends that reading the definition of "loss" to exclude all breach of contract damages would result in absurdity and illusory coverage, because the Policy explicitly provides coverage for "Wrongful Acts" arising from "Managed Care Activities," which are almost always performed through contracts. (*Id.* at 15.) Further, Benecard explains, Allied World's interpretation of the exclusion would render the "Indemnification

13

Contract Exclusion," which bars coverage liability assumed under an indemnification agreement, a nullity. (*Id.* at 15–16 (citing Allied World E&O Policy at AW193).)

Turning to the Fraud Exclusion, Benecard contends Allied World cannot escape its indemnity obligations because the Fraud Exclusion requires a final adjudication, which never occurred. (*Id.* at 20.) Benecard adds that Allied World cannot show that the portion of the Smart Settlement attributable to non-fraud claims was less than the $1.2 million covered by the remaining policy limit. (*Id.* at 21.)

Lastly, Benecard argues the Court should award it counsel fees and costs accrued in filing its summary judgment action under New Jersey Court Rule 4:42-9(a)(6). (*Id.* at 22.)

### B.    Allied World's Opposition and Moving Brief

Allied World argues Benecard is not entitled to indemnity coverage because the Policy explicitly required it to obtain Allied World's written consent before entering into settlement. (Cross Br. 12 (citing Allied World E&O Policy at AW196).) Allied World asserts Benecard failed to satisfy that condition of coverage and that Benecard did not advise it of the terms of the settlement, much less request written consent. (*Id.*) Anticipating that Benecard will argue that failure to comply may not bar coverage if the settlement was entered into in good faith, Allied World contends New Jersey courts only excuse noncompliance where the insurer wrongfully refused to provide defense coverage. (*Id.* at 12–13 (discussing *Griggs v. Bertram*, 443 A.2d 163, 173–74 (N.J. 1982); *Kindervater v. Motorists Cas. Ins. Co.*, 199 A. 606, 608–09 (N.J. 1938)).) Allied World emphasizes that it provided defense coverage and that Benecard waited until the day before the settlement-in-principal to notify it of the settlement negotiations, did not disclose the amount, and did not seek Allied World's consent. (*Id.* at 13–14.)

Turning to the exclusions, Allied World argues Smart's compensatory damages arose from Benecard's alleged breach of its contractual obligations under their contract, and any damages for

14

breach of contract fall within the Policy's exclusion of "amounts due under contract." (*Id.* at 16–17 (citing *Pinnacle Anesthesia Consultants, P.A. v. St. Paul Mercury Ins. Co.*, 359 S.W.3d 389 (Tex. App. 2012); *Nat'l Union Fire Ins., Inc. v. Hosp. Affiliates Mgmt. Corp.*, 363 N.W.2d 494 (Minn. Ct. App. 1985)).) As for the Fraud Exclusion, Allied World argues Smart's allegations clearly fall within the bounds of the Policy and that Benecard cannot ensure it obtains coverage simply by entering into a settlement. (*Id.* at 19–20.) On the contrary, Allied World explains, a "final adjudication" can be achieved in a collateral proceeding, like this action, but "Allied World is not 'seek[ing] to prove' that Benecard acted fraudulently." (*Id.* at 20.) Rather, it asks the Court to find that "any portion of Smart's alleged damages arising from or contributed to by dishonest, fraudulent or willful misconduct (including punitive damages) [is] excluded by way of the Fraud Exclusion." (*Id.*)

Lastly, Allied World argues Benecard is not entitled to attorneys' fees because the analysis is discretionary and Allied World, at least, had a good faith basis for denying indemnity coverage. (*Id.* at 22–23.)

### C. Benecard's Reply and Opposition

Benecard reiterates that the Benefits Exclusion only applies to "fees, amounts, benefits, and coverage owed" under a contract, which prevents the insurer from becoming a policyholder's guarantor but does not prohibit coverage for standard breach of contract damages. (Benecard's Opp'n 8, ECF No. 60 (citing *Am. Med. Sec., Inc. v. Exec. Risk Specialty Ins. Co.*, 393 F. Supp. 2d 693, 707–08 (E.D. Wis. 2005)).) Benecard contends that any restitution or consequential damages sought by Smart do not fall within the exclusion. (*Id.* at 9, 11–12.) The only damages that would have been excluded, according to Benecard, was a $5 million penalty if its actions resulted in the plans not functioning properly. (*Id.* at 13.) Benecard submits Smart decided not to seek those damages at trial and did not object to entry of summary judgment on that issue, so none of the

15

Smart Settlement can be attributed to the penalty. (*Id.* (citing Smart's Opp'n to Benecard's Mot. for Partial Summ. J. 44, Ex. B to Simpson Cert., ECF No. 50-6).) Further, Benecard contends Allied World's reading would also render the provision precluding coverage for "gaining any profit, remuneration or advantage to which such Insured was not legally entitled" superfluous. (*Id.* at 10 (quoting Allied World E&O Policy at AW181).)

On the Fraud Exclusion, Benecard argues Allied World could only escape contributing to the Smart Settlement if it proved at trial that Benecard intentionally defrauded Smart and that less than $1.2 million of the settlement was attributable to Smart's non-fraud claims. (*Id.* at 14.) Benecard contends that is not possible because Smart alleged both that Benecard knew its representations were false or, in the alternative, that it made the representations recklessly without knowledge as to their truth or falsity. (*Id.* (citing Smart's Compl. ¶¶ 97, 99).)

Next, Benecard argues that its defense costs had exceeded the limits of the Policy before it reached a settlement-in-principle, therefore, it had no obligation to seek Allied World's consent to the settlement. (*Id.* at 17.) Benecard claims Allied World must provide indemnity coverage unless it can show prejudice from not being given the opportunity to consent. (*Id.* at 18–19 (citing *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 89 F.3d 976, 996–97 (3d Cir. 1996); *Pittston Co. v. Allianz Ins. Co.*, 905 F. Supp. 1279, 1295 (D.N.J. 1995), *rev'd in part sub nom.*, *Pittston Co. Ultramar Am. v. Allianz Ins. Co.*, 124 F.3d 508 (3d Cir. 1997); *Phibro Animal Health Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. A-5589-13T3, 2016 WL 3884255 (N.J. Super. Ct. App. Div. July 14, 2016); *Ohaus v. Cont'l Cas. Ins. Co.*, 679 A.2d 179, 184 (N.J. Super. Ct. App. Div. 1996)).) Benecard adds that Allied World's participation in the settlement discussions would have been problematic because it would have been in Allied World's interest to steer discussions toward payment of potentially non-covered claims (i.e., the fraud claims). (*Id.* at 22.)

Additionally, Benecard asserts Allied World never would have contributed to the settlement even if it had participated because Allied World has consistently argued the Policy's Benefits Exclusion and Fraud Exclusion barred indemnity coverage. (*Id.* at 23.) Benecard submits that the prejudice issue, at the very least, raises a triable issue as to how failure to comply with the consent clause caused Allied World prejudice, how the outcome could have been better if Allied World participated, and how the settlement was the result of bad faith dealings. (*Id.*)

Benecard claims Allied World's actions are akin to the landlord in *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387 (N.J. 2005), and that Allied World cannot enforce the consent clause without breaching its implied duty of good faith and fair dealing. (*Id.* at 23.) Benecard argues Allied World withheld vital information from it with the purpose of exploiting the Policy, knew of Benecard's intent to settle, engaged in a pattern of evasion and subterfuge, and unjustly enriched itself as a result of Benecard's negotiations to reduce the defense costs. (*Id.* at 26–28.) Benecard alleges Allied World misled it into believing it could finalize the settlement with Smart to Benecard's substantial detriment, and that Allied World should be estopped from denying coverage. (*Id.* at 28–29.)

### D.   Allied World's Reply

Allied World responds that the Policy limits had not been "exhausted" before the settlement. (Allied World's Reply 2, ECF No. 64.) Although Allied World acknowledges it may be true that Benecard had incurred defense costs in excess of $5 million before settlement, Allied World states that it only had paid $1.4 million to that point and Benecard instructed it not to make further payments due to the sanctions issue. (*Id.*) Allied World argues the Policy limit could not have been exhausted before payment, (*id.* at 2–3 (citing Allied World E&O Policy at AW196)), and Benecard's instruction to stop payment clearly indicated an intent to negotiate defense counsel's costs (*id.* at 3). Allied World contends that it is not required to show appreciable

prejudice, and that the cases cited by Benecard are distinguishable because none dealt with a policy expressly requiring written consent. (*Id.* at 3–4.)

Addressing *Brunswick Hills*, Allied World argues the case is distinguishable because the landlord was notified of the tenant's intent to exercise its option nineteen months before the deadline and the tenant sought to finalize a new lease no less than ten times over the course of two years. (*Id.* at 6–7.) Allied World highlights that the tenant was met with subterfuge and foot-dragging until the landlord finally told the tenant the option had expired. (*Id.* at 7.) Here, Allied World asserts, on August 16, 2016, it was merely informed of the possibility of settlement talks but was not invited to participate; Allied World was not advised a settlement was expected until September 1, 2016, and even then was not given the approximate value. (*Id.* at 7–8.) Allied World asserts it asked for the settlement amount when it was told of the settlement-in-principle but was told the amount would not be disclosed until the paperwork was finalized. (*Id.* at 8.) Allied World adds that it was not told of the settlement amount until October 6, 2016 when it received a copy of the fully executed agreement. (*Id.* (citing Sealed Notepad of All Claims at AW2512, Ex. A to Supp. Simpson Cert., ECF No. 65).)

Allied World asserts "loss" is defined not to include any "amounts" "owed under any contract," which would include amounts under a contract for which the insured is held liable. (*Id.* at 10.) Allied World asserts that part of the definition of loss does not constitute an exclusion just because it is a limitation on coverage, and that Benecard bears the burden of proving its loss falls within the definition of "loss" under the Policy. (*Id.*) Application of the definition does not render the Policy's coverage illusory, Allied World argues, and the doctrine of reasonable expectations is inapplicable without an ambiguity. (*Id.* at 12.)

Allied World further argues, "[a]lthough the Fraud Exclusion requires an admission or final adjudication of the prohibited conduct, such a result can be achieved by way of the pending motions for summary judgment" because "the only damages sought by Smart against Benecard were those arising from Benecard's breach of contract (barred from coverage under the definition of 'Loss') and various forms of fraud (barred from coverage under the Fraud Exclusion)." (*Id.* at 13–14.) Allied World adds, "to the extent Benecard asserts that a portion of the settlement pertains to punitive damages, that amount also is barred from coverage under the Allied World Policy pursuant to the definition of 'Loss' and by public policy." (*Id.* at 14–15 (citing *Johnson & Johnson v. Aetna Cas. & Sur. Co.*, 667 A.2d 1087, 1091–92 (N.J. Super. Ct. App. Div. 1995); *Fireman's Fund Ins. Co. v. Imbesi*, 826 A.2d 735, 757 (N.J. Super. Ct. App. Div. 2003)).)

## IV.   **LEGAL STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250).

"Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue of material fact . . . .'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). "When ruling on cross-motions for summary judgment, the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Einhorn v. Kaleck Bros.*, 713 F. Supp. 2d 417, 421 (D.N.J. 2010).

## V.   **DISCUSSION**

### A.   **Applicable Law**

Interpreting an insurance contract is a legal question to be resolved by the Court. *Rena. Inc. v. Brian*, 708 A.2d 747, 756 (N.J. Super. Ct. App. Div. 1998). "Absent statutory [prohibitions], an insurance company has the right to impose whatever conditions it desires prior to assuming its obligations and such provisions should be construed in accordance with the language used." *Wyndham Constr., LLC v. Columbia Cas. Ins. Co.*, 208 F. Supp. 3d 599, 602 (D.N.J. 2016) (quoting *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 721 (1960)). "In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). "If the language is clear, that is the end of the inquiry." *Id.* "If the plain language of the policy is unambiguous," the Court should "not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased." *Templo Fuente De Vida*

*Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1075 (N.J. 2016) (quoting *Chubb Custom Ins. Co.*, 948 A.2d at 1289) (internal citations omitted)).

A provision in an insurance policy that "is subject to more than one reasonable interpretation . . . is ambiguous." *Templo*, 129 A.3d at 1075. The New Jersey Supreme Court has advised "that '[w]here the policy language [of an insurance policy] supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001) (quoting *Lundy v. Aetna Cas. & Sur. Co.*, 458 A.2d 106, 111 (N.J. 1983)). This approach, however, is limited to instances where "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Id.* (citations omitted). "When construing an ambiguous clause in an insurance policy, courts should consider whether clearer draftsmanship by the insurer 'would have put the matter beyond reasonable question.'" *Id.* (quoting *Doto v. Russo*, 659 A.2d 1371, 1377 (N.J. 1995)). "Far-fetched interpretations of a policy exclusion are insufficient to create an ambiguity requiring coverage." *Wear v. Selective Ins. Co.*, 190 A.3d 519, 528 (N.J. Super. Ct. App. Div. 2018). "Neither the duty to defend nor the duty to indemnify 'exists except with respect to occurrences for which the policy provides coverage.'" *Id.* at 528–29 (quoting *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 483 A.2d 402, 405 (N.J. 1984)).

"The leading case dealing with the right of an insurer to disclaim coverage based on a breach of its insured's duties under the policy is *Cooper v. Government Employees Insurance Company*, [237 A.2d 870 (N.J. 1968)]." *Hager v. Gonsalves*, 942 A.2d 160, 163 (N.J. Super. Ct. App. Div. 2008). In *Cooper*, the New Jersey Supreme Court held that a bargained-for protection could not be forfeited due to noncompliance with a notice provision "unless there are both a breach of the notice provision and a likelihood of appreciable prejudice." *Cooper*, 237 A.2d at 874.

"*Cooper* dealt with an insured's breach of its obligation to give the insurer timely notice of an accident"; thereafter, the New Jersey Superior Court, Appellate Division, extended the appreciable prejudice requirement to breaches of the duty of cooperation in *Solvents Recovery Service of New England v. Midland Insurance Co.*, 526 A.2d 1112 (N.J. Super Ct. App. Div. 1987). *Hager*, 942 A.2d at 163–64. In *Solvents Recovery*, the Appellate Division "held that the appreciable prejudice rule should apply to several conditions of the 'occurrence' policy," including a requirement "that the policyholder cooperate with the insurance company, and not make any voluntary payments." *Resolution Tr. Corp. v. Moskowitz*, 868 F. Supp. 634, 640 (D.N.J. 1994).

The New Jersey Supreme Court recently explained that although the "*Cooper* doctrine has a clear application to ['occurrence'] policies, . . . *[i]t has . . . no application whatsoever to a 'claims made' policy that fulfills the reasonable expectations of the insured* with respect to the scope of coverage." *Templo*, 129 A.3d at 1078 (alterations, omissions, and emphasis in original) (quoting *Zuckerman v. Nat'l Union Fire Ins. Co.*, 495 A.2d 395, 406 (1985)); *see also Modern Techs. Grp., Inc. v. Twin City Fire Ins. Co.*, No. 09-3393, 2010 WL 3908685, at *6 (D.N.J. Sept. 30, 2010) (distinguishing *Moskowitz* because the policy before the Court was a claims made policy). As the New Jersey Supreme Court discussed, "[b]oth 'claims made' and 'occurrence' policies contain reporting requirements, but the importance and terms of those requirements differ." *Templo*, 129 A.3d at 1077. "In the 'occurrence' policy, notice provisions are written "to aid the insurance carrier in investigating, settling, and defending claims." *Id.* (quoting *Zuckerman*, 495 A.2d at 405). "'Claims made' policies commonly require that the claim be made and reported *within* the policy period, thereby providing a fixed date after which the insurance company will not be subject to liability," and "also tend to have an additional 'notice of claim' provision phrased in terms of the insured notifying the insurer of a claim or potential claim 'promptly' or the like[.]" *Id.* (internal

quotation marks omitted) (emphasis in original). "[T]he requirement of notice in an occurrence

policy is subsidiary to the event that invokes coverage, and the conditions related to giving notice

should be liberally and practically construed"; but "the event that invokes coverage under a 'claims

made' policy is transmittal of notice of the claim to the insurance carrier," and "[i]n exchange for

limiting coverage only to claims made during the policy period, the carrier provides the insured

with retroactive coverage for errors and omissions that took place prior to the policy period." *Id.*

(quoting *Zuckerman*, 495 A.2d at 406).[2]

---

[2] Benecard argues the distinction between claims made and occurrence coverage is only relevant when an insurer disclaims coverage based on late notice and that the distinction bears no relevance to consent obligations. (Benecard's Opp'n 19 n.9.) But all except one of the cases cited by Benecard fit within the *Cooper-Solvents Recovery* rubric. *See, e.g., Chem. Leaman Tank Lines*, 89 F.3d at 996 ("An insurer that seeks to disclaim coverage based upon untimely notice from its insured under an occurrence-based policy must demonstrate that it has suffered 'appreciable prejudice.'" (citing *Cooper*, 237 A.2d 870)); *Ohaus*, 679 A.2d at 182, 184 (involving an occurrence policy and applying *Cooper*); *Phibro Animal Health Corp.*, No. A-5589-13T3, 2016 WL 3884255, at *4 (occurrence policy). The only outlier appears to be *Pittston Co. v. Allianz Ins. Co.*, 905 F. Supp. 1279 (D.N.J. 1995). In *Pittston Co. v. Allianz Ins. Co.*, the insured sold a marine oil terminal to a third-party but maintained an obligation to indemnify the third-party for damages caused by contamination of the site during the insured's ownership. 905 F. Supp. at 1291. Before bringing its claims to court, the third-party informed the insured that it believed the insured was liable for petroleum contamination of the site. *Id.* The insured gave notice to the insurer and attached a proposed settlement agreement. *Id.* Three days after the parties settled, the insurer informed the insured it needed more time to take a position on coverage. *Id.* The insurer later objected to coverage, arguing "it did not have a meaningful opportunity to object to the settlement." *Id.* at 1293. The court explained that "[g]enerally, where an insured settles a claim against it without the permission of the insurer, the insurer must, nonetheless, demonstrate prejudice before being relieved of its policy obligations." *Id.* at 1295. The Court acknowledged "that many of the cases that subscribe to this proposition arise in the context of an insurer's refusal to defend," but the court ultimately relied on the principle of fairness. *Id.* (citing *Griggs*, 443 A.2d at 172–173). The court concluded, "[w]here there is no genuine question that the settlement reached by the insured is what the insured legitimately owes, it is equitable to require the insurer to respond," and found "that the settlement was reasonable and [the insurer's] interests were not prejudiced by it." *Id.* It should be noted, however, that the policies at issue were occurrence policies. *Id.* at 1300. Benecard cites no authority to support its contention that the appreciable prejudice requirement applies to a claims made policy or to the failure to satisfy an express condition of coverage in such a policy. Moreover, as explained below, it appears the appreciable prejudice requirement does not apply. *N.J. Eye Ctr., P.A. v. Princeton Ins. Co.*, 928 A.2d 25, 32–33 (N.J. Super. Ct. App. Div. 2007).

"All contracts impose an implied obligation of good faith and fair dealing in their performance and enforcement." *Badiali v. N.J. Mfrs. Ins. Grp.*, 107 A.3d 1281, 1287 (N.J. 2015) (citing *Sears Mortg. Corp. v. Rose*, 634 A.2d 74, 84 (N.J. 1993)). "The good faith obligations of an insurer to its insured run deeper than those in a typical commercial contract." *Id.* "Unlike with a typical commercial contract, in which '[p]roof of bad motive or intention' is vital to an action for breach of good faith, an insurer's breach of good faith may be found upon a showing that it has breached its fiduciary obligations, regardless of any malice or will." *Id.* (quoting *Brunswick Hills Racquet Club, Inc.*, 864 A.2d at 396 (internal quotations omitted)) (citing *Bowers v. Camden Fire Ins. Ass'n*, 237 A.2d 857, 865–66 (1968)).

"'Estoppel is an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law.' The doctrine is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." *Boritz v. N.J. Mfrs. Ins. Co.*, 968 A.2d 1223, 1227 (N.J. Super. Ct. App. Div. 2009) (citation omitted).

> To establish a claim of estoppel, a party must prove, by a preponderance of the evidence, that the alleged conduct was done, or representation was made, intentionally or under such circumstances that it was both natural and probable that it would induce action. Further, the conduct must be relied on, and the relying party must act so as to change his or her position to his or her detriment.

*Id.* (quoting *Miller v. Miller*, 478 A.2d 351, 356 (N.J. 1984)). "Although '[t]he strongest and most frequent situation giving rise to such an estoppel is one wherein a carrier undertakes to defend a lawsuit based upon a claim against its insured,' an insurer also may be estopped by other forms of conduct acknowledging coverage upon which an insured justifiably relies." *Barrett v. N.J. Mfrs. Ins. Co.*, 685 A.2d 975, 978 (N.J. Super. Ct. App. Div. 1996) (quoting *Griggs*, 443 A.2d at 167) (alteration in original) (internal citation omitted).

24

In *Barrett*, the plaintiff, who had been injured in an automobile accident, was offered a settlement by the tortfeasor and requested and received a consent to settle correspondence from her personal insurance carrier. *Id.* at 975–76. Following a decision by the New Jersey Supreme Court, the carrier attempted to disclaim coverage, but the Appellate Division held the carrier was estopped from denying coverage based on the plaintiff's reliance on the correspondence. *Id.* at 977–78. In *Boritz*, the Appellate Division estopped enforcement of a step-down clause where the insurance carrier confirmed the policy limit but failed to note that amount could be reduced by the step-down clause. 968 A.2d at 1229. The Court held

> When an insurance carrier receives a *Longworth* [*v. Van Houten*, 538 A.2d 414 (N.J. Super. Ct. App. Div. 1988),] request to settle, good faith requires the carrier to advise the injured party of the potential setoff in the policy afforded by the step-down provision before the injured party settles with the tortfeasor.

*Id.*

"[U]nder certain circumstances, prejudice may be presumed." *Id.* at 1227. Insureds "must avoid independent action which will contravene any of the essential terms of the policy; compliance with such provisions is a condition precedent to recovery under the policy and their breach can cause a forfeiture of coverage." *Griggs*, 443 A.2d at 169. "[A]n insured cannot take any meaningful steps toward an early settlement of the claim without risking loss of coverage pursuant to the provision prohibiting it from voluntarily compromising liability or independently settling the claim." *Id.* "[W]here, after timely notice, adequate opportunity to investigate a claim, and the knowledge of a basis for denying or questioning insurance coverage, the insurance carrier fails for an unreasonable time to inform the insured of a potential disclaimer, it is estopped from later denying coverage under the insurance policy." *Id.* at 171. "Where an insurer wrongfully refuses coverage and a defense to its insured, . . . the insurer is liable for the amount of the judgment obtained against the insured or of the settlement made by him." *Fireman's Fund Ins. Co. v. Sec.*

*Ins. Co.*, 367 A.2d 864, 868 (N.J. 1976) (quoting *N.J. Mfrs. Indem. Ins. Co. v. U.S. Cas. Co.*, 220 A.2d 708, 710 (N.J. Super. Ct. App. Div. 1966)). "The only qualifications to this rule are that the amount paid in settlement be reasonable, and that the payment be made in good faith." *Id.* (quoting *N.J. Mfrs. Indem. Ins. Co.*, 220 A.2d at 710). In other words, "the specific consequences of the insurer's unjustified refusal to comply with its contractual obligation to defend include the forfeiture of the insurer's right to insist on compliance by the insured with prohibitory policy provisions, such as . . . those prohibiting settlement." *Id.* at 868; *see also Passaic Valley Sewerage Comm'rs v. St. Paul Fire & Marine Ins. Co.*, 21 A.3d 1151, 1162 (2011) ("A breach of the duty to defend will trigger indemnification of the . . . settlement, and will not be limited to the . . . Policy's definition of 'loss.'").

The Appellate Division considered the applicability of those principles in *New Jersey Eye Center*, where the insurer "provided a defense to its insured, . . . albeit under a reservation of rights." 928 A.2d at 32. The court found that consideration of whether the settlement was reasonable and entered in good faith "simply immaterial because the purported settlement represented such a fundamental breach of the insured's obligations to [the insurer]." *Id.* at 33. The court explained "the terms of the settlement reached . . . may . . . have been 'a reasonable business decision' . . . , but they were in complete derogation of [the insured's] obligations . . . under its policy with [the insurer]," "which include[d] the duty to '[c]ooperate . . . in the investigation, settlement, or defense of the claim or suit' and the duty not to 'assume any obligation . . . without [the insurer's] consent.'" *Id.* (second alteration in original) (last omission in original).

## B. The Plain Language of the Policy

The Court begins with the plain language of the Policy's exclusions. The definition of "loss" excludes "fees, amounts, benefits[,] or coverage owed under any contract with any party

26

including providers of health care services, health care plan or trust, insurance or workers' compensation policy or plan or program of self-insurance." (Allied World E&O Policy at AW202.)

Allied World contends that limitation on the definition of loss includes liabilities arising out of breaches of contract, (Cross Br. 16–17), whereas Benecard claims the provision is simply designed to prevent the insurer from becoming the insured's guarantor for amounts owed under contracts, (Benecard's Opp'n 8). Benecard highlights *Old Berliner Liquidating Tr.*, 2012 WL 1868379, at *1, where the policy at issue contained a clear breach of contract exclusion. (Moving Br. 14.) It also cites *American Medical Security, Inc. v. Executive Risk Specialty Ins. Co.*, (Benecard's Opp'n 8), in which the United States District Court for the District of Wisconsin held the definition of "loss"—which explicitly carved out "fees, amounts, benefits[,] or coverage owed under any contract"—only excluded "unpaid benefits due under [] various [heath care] policies," but not "damages flowing from the breach or other wrong." 393 F. Supp. 2d 693, 707–08.

Allied World relies on two out-of-district cases. The first held a similar definition of loss precluded coverage of lost earnings arising from the breach of an employment contract. *Pinnacle*, 359 S.W.3d at 395. The second held that lost profits, which represented sums payable under the management agreement and lost goodwill, were excluded by a definition of loss that did not include "any amounts due or payable under the terms of any contractual obligation." *Hosp. Affiliates Mgmt.* Corp., 363 N.W.2d at 496.

Allied World's cases are unpersuasive, and the Court declines to follow them. The Court finds both parties' proffered interpretations reasonable and, thus, concludes the clause is ambiguous. *Templo*, 129 A.3d at 1075. The definition of loss does not address damages or liabilities arising out of breaches of contract. (Allied World E&O Policy AW202–04.) Further, as Benecard notes and Allied World fails to counter, (Moving Br. 16, *see* Cross Br. 16–19), a limited

27

definition of loss would render the exclusion for expenses or liabilities arising under an indemnity agreement superfluous, (*see* Allied World E&O Policy AW193). Clearer draftsmanship would have avoided this ambiguity and, guided by New Jersey's principles of insurance policy interpretation, the Court adopts Benecard's narrower reading of the limitation. *Progressive*, 765 A.2d at 202. Specifically, the Court reads "amounts . . . owed under any contract" as excluding from the definition of loss money that Benecard would have owed under a contract regardless of a party's breach. As Benecard argues, the Court reads the limitation as protecting the insurer from becoming a guarantor of Benecard's payment obligations; damages arising from the breach of a contract, including consequential damages and restitution, are not be precluded.

The Fraud Exclusion's applicability is contingent upon "an admission or final adjudication in a proceeding constituting the **Claim**, or in a proceeding separate from or collateral to any proceeding constituting the **Claim**." (Allied World E&O Policy AW181.)[3] Allied World argues that, because Smart only asserted claims of fraudulent misrepresentation and breach of contract, application of both the broad definition of loss and the Fraud Exclusion would allow the Court to find no coverage under the Policy. (Allied World's Reply 13–14.) Because the Court declines to adopt Allied World's expansive definition of loss, it cannot find that any amount of the unapportioned settlement is excluded from coverage under the Policy. Additionally, the Court notes that Smart alleged, "alternatively," that Benecard "made [its misrepresentations and omissions] recklessly and without knowledge as to their truth or falsity." (Smart's Compl. ¶ 97.) Accordingly, the Court finds the plain language of the definition of loss and the Fraud Exclusion do not preclude coverage of the Smart Settlement under the Policy.

---

[3] The parties do not dispute that there is no final adjudication as to Smart's fraud claims against Benecard because the Smart Action was settled. (*See* Allied World's Reply 13–15.)

28

### C.  Duty to Seek Consent

The Consent Clause provides that "no settlement or offer of settlement of any **Claim** may be made[] without the **Underwriter's** prior written consent, such consent not to be unreasonably withheld," and that "[n]o coverage is available under this Policy for . . . any settlements or settlement offers made[] without the **Underwriter's** prior written consent." (Allied World E&O Policy at AW196.)

The parties dispute whether Benecard asked Allied World to contribute to the settlement. (BMF ¶ 46; AWRMF ¶ 46; Benecard's Opp'n Br. 6.) Both cite to a September 2, 2016 entry in Allied World's Claim Summary. (BMF ¶ 46 (citing Claim Summary Report 3); AWRMF ¶ 46 (citing Claim Summary Report 3).) The entry states, in relevant part,

> Counsel noted that they understood that defense expenses would soon exhaust the limits of liability for the E & O policy if the matter continued to trial. Obviously, they would like to have money go towards a settlement rather than defense expenses. They noted that they have an argument that [DLA Piper] was more concerned with their billing than advancing the insured's interests. I had no comment to that assertion and *there was no discussion on contribution from Allied World towards the settlement.*

(Claim Summary Report 3 (emphasis added).)

There is no triable issue of material fact as to whether the Consent Clause was satisfied because the evidence shows that there was no discussion about Allied World's contribution to the Smart Settlement. The entry merely notes Allied World's impression that Benecard would prefer the Policy cover a settlement rather than defense costs. With no evidence that Benecard sought Allied World's consent to the settlement, a trier of fact could not conclude that Allied World unreasonably withheld its consent. This determination is partly informed by the fact that, even though Benecard asserts it asked for the remaining coverage to be applied to a settlement, Benecard does not claim it sought Allied World's consent; Benecard repeatedly stresses that it had no

obligation to seek Allied World's consent because it had exhausted the Policy limits. (Benecard's Opp'n 6, 17–18.)

Moreover, Benecard does not argue that Allied World unreasonably denied coverage; instead, Benecard argues that it either had no obligation to comply with the Consent Clause or that Allied World is estopped form invoking it. (*Id.* at 17–30.) There is no dispute that Benecard never obtained written consent from Allied World. Accordingly, the condition precedent to coverage was not satisfied. Strict adherence to the clear language of the Policy mandates the Court conclude that Benecard is foreclosed from obtaining indemnity coverage for the Smart Settlement.

Benecard argues it had no obligation to seek Allied World's consent because it had exhausted the Policy limits at the time of settlement. (*Id.* at 17.) Citing the Policy's language, Allied World contends the Policy limits were not exhausted because Allied World had not yet paid the full Policy limit and Benecard's instruction to stop payment demonstrated intent to negotiate its defense costs. (Allied World's Reply 2–3.)

The plain language of the Policy supports Allied World's reading. The Policy states, "[t]he **Underwriter** will have no obligation to pay **Loss,** including **Defense Expenses,** after the **Underwriter's** maximum aggregate Limit of Liability . . . has been exhausted by the payment of **Loss,** including **Defense Expenses.**" (Allied World E&O Policy at AW196.) The undisputed evidence merely shows Benecard anticipated its defense costs to exceed the Policy limits, not that those costs did exhaust the limits of the Policy. (Claim Summary Report 3.) Moreover, Benecard instructed Allied World to stop payment on DLA Piper's invoices, (AWMF ¶ 37; BRMF ¶ 37), preventing the exhaustion of its coverage under the Policy. Benecard cites no authority in support of its position that it may be excused from an express condition of coverage where more of the

Policy limit becomes accessible after the ability to satisfy that condition has passed. (Benecard's Opp'n Br. 17–18.)

### D.    Appreciable Prejudice

Benecard also argues that Allied World must show appreciable prejudice before it can invoke the Consent Clause to deny indemnification coverage. (*Id.* at 18–23.) The Court finds no basis for imposing that requirement here. The appreciable prejudice requirement derives from the New Jersey Supreme Court's decision in *Cooper*, 237 A.2d at 874, and was expanded in *Solvents Recovery*, 526 A.2d at 1114, to include cooperation provisions. The New Jersey Supreme Court has recently reaffirmed that the applicability of the so-called *Cooper* doctrine is limited to occurrence policies. *Templo*, 129 A.3d at 1078. Although the New Jersey Supreme Court's discussion in *Templo* concerned notice provisions, Benecard cites no authority to demonstrate *Cooper* or *Solvents Recovery* has been expanded to claims made policies. It appears the doctrine has not. *Moskowitz*, 868 F. Supp. at 640; *see also Travelers Cas. & Sur. Co. v. Becton Dickinson & Co.*, No. 14-4410, 2016 WL 10572642, at *1 (D.N.J. Apr. 5, 2016); *Modern Techs. Grp.*, No. 09-3393, 2010 WL 3908685, at *6 (D.N.J. Sept. 30, 2010); *N.J. Eye Ctr.*, 928 A.2d at 33. The Allied World E&O Policy is a claims made policy, (Allied World E&O Policy, at AW169, 192, 195–96), thus the Court finds Allied World is not required to demonstrate appreciable prejudice.

### E.    Equitable Estoppel and the Duty of Good Faith

Benecard's argument, however, also appears to implicate the estoppel principles outlined in *Griggs*, which held that when an insurer is estoped from denying coverage of a settlement, "[the] settlement may be enforced against an insurer . . . only if it is reasonable in amount and entered into in good faith." 443 A.2d at 174. The estoppel principles discussed in *Griggs* are conceptually distinct from the *Cooper* doctrine. *See Hatco Corp. v. W.R. Grace & Co.--Conn.*, 801 F. Supp. 1334, 1362–63, 1366 (D.N.J. 1992).

31

In *Griggs*, the New Jersey Supreme Court held that

> where, after timely notice, adequate opportunity to investigate a
> claim, and the knowledge of a basis for denying or questioning
> insurance coverage, the insurance carrier fails for an unreasonable
> time to inform the insured of a potential disclaimer, it is estopped
> from later denying coverage under the insurance policy.

443 A.2d at 171. The Court further held that, because the insurer "is estopped from denying
coverage under the policy, it is similarly estopped from insisting on compliance with the 'no
action' provision of the policy." *Id.* at 172.

A necessary predicate for estopping denial of coverage is either a wrongful denial of
defense coverage, *Fireman's Fund*, 367 A.2d at 868, or an unreasonable delay in informing the
insured of a potential disclaimer of coverage, *Griggs*, 443 A.2d at 172. Neither of those
circumstances are present in this case. Allied World funded Benecard's defense under a reservation
of rights that explicitly noted that the Policy required Benecard to obtain written consent before
entering a settlement, and there is no allegation Allied World declined indemnification coverage
before the Smart Settlement was consummated. Accordingly, Allied World cannot be estopped
from denying coverage of the Smart Settlement and need not show prejudice.

Benecard further argues that Allied World should be estopped from denying coverage
under the Consent Clause because Allied World breached its duty of good faith by not reminding
Benecard of the Consent Clause after Benecard informed Allied World of the settlement talks.
(Benecard's Opp'n Br. 23, 28.) Benecard analogizes this case to *Brunswick Hills Racquet Club*,
864 A.2d at 389. (*Id.* at 23–28.)

In *Brunswick Hills Racquet Club*, a tenant notified its landlord of its intent to exercise an
option nineteen months in advance of the contractual deadline, but did not make the up-front
payment necessary to perfect the option, believing that the payment was required only at the time
of closing of the new lease. 864 A.2d at 389. "Over the next nineteen months, the tenant, through

32

its attorneys, repeatedly wrote and spoke with agents of the landlord for the purpose of setting the date and terms of the closing." *Id.* "The landlord's agents, through a series of written and verbal evasions, delayed responding to the persistent requests of the tenant," and "never requested the option payment money or advised the tenant that it had not fulfilled an essential term of the contract." *Id.* "When the deadline for exercising the option passed, the landlord, for the first time, pointed out the deficiency to the tenant," and "told the tenant that the option was 'null and void.'" *Id.* The trial court "found that the covenant of good faith and fair dealing was not violated by the landlord's artful dodging and studied silence"; the New Jersey Supreme Court disagreed and reversed. *Id.* In allowing the tenant to exercise the option, the Court explained "[t]he breach of the covenant of good faith and fair dealing in this case was not a landlord's failure to cure a tenant's lapse," but "a demonstrable course of conduct, a series of evasions and delays, that lulled plaintiff into believing it had exercised the lease option properly." *Id.* at 399. The Court added, "[the landlord] acted in total disregard of the harm caused to [the tenant], unjustly enriching itself with a windfall increase in rent at [the tenant's] expense." *Id.*

According to Benecard, five weeks before the settlement was executed, it advised Allied World of the possibility of settlement talks. (BSMF ¶ 6.) Three weeks before finalization, it informed Allied World that it and Smart were finalizing a term sheet and asked Allied World to contribute the Policy limits to the settlement. (BSMF ¶ 8.) And two weeks before finalization, it informed Allied World they had reached a settlement-in-principle. (BSMF ¶ 10.) Between August 16, 2016, and September 22, 2016, when the settlement was finalized, Benecard alleges Allied World never objected, never asked to be involved, and never raised the lack of consent. (BSMF ¶¶ 11–12.)

Even accepting Benecard's rendition of the events as true, the Court finds the doctrine of equitable estoppel is inapplicable because Benecard has failed to identify any conduct upon which it relied in believing the condition to coverage was satisfied. At best, Benecard's assertion that it told Allied World to apply the remaining limits of the Policy to the settlement represents a misunderstanding of the terms of the Policy. Benecard was reminded of the Consent Clause in Allied World's March 12, 2015 correspondence, in which Allied World reserved its rights under the Policy. (Allied World's Mar. 12, 2015 Correspondence 9.)

Benecard does not allege it sought consent from Allied World or that Allied World unreasonably withheld or simply ignored its request. Instead, Benecard claims that it was relieved of the obligation to seek consent due to its then-accrued defense costs or that Allied World should have injected itself into the settlement talks. Under the plain language of the Policy it was the insured's obligation to seek consent to the settlement. Unlike the tenant in *Brunswick Hills Racquet Club*, Benecard does not identify a pattern of evasive conduct that lulled it into a false sense that the condition was satisfied. Rather, Benecard merely informed Allied World of the possibility of settlement talks, (BSMF ¶ 6), then allegedly sought application of the Policy the same day it was finalizing the settlement, (BMF ¶¶ 45–46; Claim Summary Report 3), the day before Benecard notified the court overseeing the Smart Action that the parties reached a settlement and would "embody the terms of their settlement in final settlement documents," (Joint Sept. 2, 2016 Correspondence). Benecard's allegations show it simply never sought Allied World's participation in the settlement discussions. Therefore, the Court concludes the doctrine of equitable estoppel cannot be applied in this case. The failure to comply with the Consent Clause is fatal to its claim for indemnity coverage. The Court, therefore, must deny Benecard's Motion.

Having determined as a matter of law that the theories proffered by Benecard to prevent enforcement of the plain terms of the Consent Clause are inapplicable, the Court finds coverage of the Smart Settlement barred because Benecard failed to seek and obtain Allied World's written consent to the Smart Settlement. Accordingly, the Court concludes there can be no indemnity coverage under the Policy and grants Allied World's Motion.

## VI.    CONCLUSION

For the reasons stated above, Benecard's Motion for Partial Summary Judgment is denied, and Allied World's Cross-Motion for Summary Judgment is granted. Declaratory judgment will be entered in Allied World's favor that it is not liable to provide indemnity coverage for the Smart Settlement under the Policy.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**
